## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| DON'T LOOK MEDIA, LLC, a Delaware Limited Liability Company,<br><br>              Plaintiff,<br>vs.<br><br>FLY VICTOR LIMITED, a company incorporated under the Laws of England and Wales, ALYSSUM GROUP LIMITED, a company incorporated under the Laws of England and Wales, ALYSSUM HOLDINGS LIMITED, a company incorporated under the Laws of England and Wales, CLIVE HENRY JACKSON, an individual, BERNARDUS VORSTER, an individual, DAN NORTHOVER, an individual, and JOHN DOE(S), an unknown person(s)/corporation(s),<br><br>              Defendants._____ | CASE NO: |

## COMPLAINT

**COMES NOW**, Plaintiff, **DON'T LOOK MEDIA, LLC**, a Delaware Limited Liability Corporation ("Plaintiff" or "DLM"), by and through undersigned counsel, and hereby sues Defendants, **FLY VICTOR LIMITED**, a company incorporated under the Laws of England and Wales ("Fly Victor"), **ALYSSUM GROUP LIMITED**, a company incorporated under the Laws of England and Wales ("Alyssum"), **ALYSSUM HOLDINGS LIMITED**, a company incorporated under the Laws of England and Wales ("Alyssum Holdings"), **CLIVE HENRY JACKSON** an individual ("Jackson"), **BERNARDUS VORSTER**, an individual ("Vorster"), **DAN NORTHOVER**, an individual ("Northover"), and **JOHN DOE(S)**, an unknown person(s)/corporation(s), and alleges as follows:

1

## PARTIES, JURISDICTION, AND VENUE

1.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C § 1331 and § 1332. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

2.   Plaintiff DLM is a Delaware Limited Liability Corporation whose principle place of business is in Broward County, Florida and is otherwise *sui juris*.

3.   Defendant Fly Victor is a Company incorporated and existing under the laws of England and Wales and regularly conducts business in the United States as well in the Southern District of Florida and is otherwise *sui juris*. This Defendant is also subject to personal jurisdiction pursuant to Fla. Stat. § 48.193 as it is alleged herein that Defendant engages in substantial and not isolated activities within the State of Florida and otherwise has sufficient contacts within this jurisdiction upon which to support personal jurisdiction, and because subjecting it to personal jurisdiction in the Southern District of Florida does not otherwise offend traditional notions of fair play and substantial justice.

4.   Defendant Alyssum is a Company incorporated and existing under the laws of England and Wales and regularly conducts business in the United States as well as in the Southern District of Florida and is otherwise *sui juris*. This Defendant is also subject to personal jurisdiction pursuant to Fla. Stat. § 48.193 as it is alleged herein that Defendant engages in substantial and not isolated activities within the State of Florida and otherwise has sufficient contacts within this jurisdiction upon which to support personal jurisdiction, and because subjecting it to personal jurisdiction in the Southern District of Florida does not otherwise offend traditional notions of fair play and substantial justice.

5.   Defendant Alyssum Holdings is a Company incorporated and existing under the laws of England and Wales and regularly conducts business in the United States as well as in the Southern District of Florida and is otherwise *sui juris*. This Defendant is also subject to personal jurisdiction pursuant to Fla. Stat. § 48.193 as it is alleged herein that Defendant engages in substantial and not isolated activities within the State of Florida and otherwise has sufficient contacts within this jurisdiction upon which to support personal jurisdiction, and because subjecting it to personal jurisdiction in the Southern District of Florida does not otherwise offend traditional notions of fair play and substantial justice.

6.   Defendant Jackson, upon information and belief, is an individual residing in England and who is subject to personal jurisdiction in the Southern District of Florida and in this Court pursuant to Florida Statutes § 48.193 in that he conducts substantial and not isolated business within this jurisdiction and otherwise has sufficient contacts upon which to support personal jurisdiction, and because subjecting him to personal jurisdiction in the Southern District of Florida does not otherwise offend traditional notions of fair play and substantial justice. This Defendant is also subject to personal jurisdiction pursuant to Fla. Stat. § 48.193 as it is alleged herein that Defendant committed a tort within the State of Florida.

7.   Defendant Vorster, upon information and belief, is an individual residing in England and who is subject to personal jurisdiction in the Southern District of Florida and in this Court pursuant to Florida Statutes § 48.193 in that he conducts substantial and not isolated business within this jurisdiction and otherwise has sufficient contacts upon which to support personal jurisdiction, and because subjecting him to personal jurisdiction in the Southern District of Florida does not otherwise offend traditional notions of fair play and substantial justice. This Defendant is also

3

subject to personal jurisdiction pursuant to Fla. Stat. § 48.193 as it is alleged herein that Defendant committed a tort within the State of Florida.

8. Defendant Northover, upon information and belief, is an individual residing in England and who is subject to personal jurisdiction in the Southern District of Florida and in this Court pursuant to Florida Statutes § 48.193 in that he conducts substantial and not isolated business within this jurisdiction and otherwise has sufficient contacts upon which to support personal jurisdiction, and because subjecting him to personal jurisdiction in the Southern District of Florida does not otherwise offend traditional notions of fair play and substantial justice. This Defendant is also subject to personal jurisdiction pursuant to Fla. Stat. § 48.193 as it is alleged herein that Defendant committed a tort within the State of Florida.

9. Defendant(s) John Doe(s) is/are unknown persons or entities who are within the jurisdiction of this Court who is/are, upon information and belief, responsible/liable/culpable to Plaintiff for damages relative to its claims herein.

10. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391 (b)(2) and (3) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint arose in this District and Defendants are subject to the Court's personal jurisdiction with respect to this action.

## RESERVATION TO NAME ADDITIONAL DEFENDANTS

11. In addition to the entities set forth as Defendants herein, there are likely other parties who may well be liable to Plaintiff but respecting whom Plaintiff currently lacks specific facts to permit Plaintiff to name such person or persons as a party-defendant(s). By not naming such persons or entities at this time, Plaintiff is not waiving his right to amend this pleading to add such parties, should the facts warrant adding such parties.

## PRELIMINARY STATEMENT

12. This case presents the intentional fraudulent scheme and criminal enterprise devised by **Defendants Jackson, Vorster, Northover, and John Doe(s)** to defraud Plaintiff out of tens of millions of dollars of revenue share remunerations and thereafter funneling illegally stolen profits in the form of nefarious transfers through an international corporate money laundering spiderweb which lined their personal pockets and avoided tax consequences. These Defendants' theft of monies owed to Plaintiff also served their plan to deceive investors of Defendant Fly Victor regarding its success and health with inflated projections and "profits" designed to procure capital infusions which were, in part, used to directly and indirectly increase salaries and pay for lavish lifestyles.

13. This case also involves the intentional and/or grossly reckless defacing and "conversion" of Plaintiff's world class website domain landing page, PrivateJet.com ("PrivateJet") through **failure to comply with United States Department of Transportation ("USDOT") and Federal Aviation Administration ("FAA") regulations** and thereby subjecting Defendant Fly Victor and PrivateJet to the potential of millions of dollars in fines for unfair and deceptive practices – all in a calculated effort to eliminate PrivateJet as one of Fly Victor's leading competitors in the online private air charter industry.

14. In February 2019, through an attempt to seek resolution of the damage done to PrivateJet, Plaintiff notified Defendant Fly Victor and Defendant Jackson regarding the USDOT and FAA violations.  Without consulting Plaintiff or the USDOT or FAA, and **in an implicit admission of guilt, on or about March 23, 2019, Defendant Fly Victor attempted to quietly conceal its wrongdoing by modifying certain disclosures on its own website.  However, _Defendant Fly_**

**Victor's actions seemingly further violated USDOT and FAA regulations and resulted in further damage to it and to Plaintiff.**

15. Plaintiff herein seeks redress and compensation for actual, compensatory, treble and punitive damages in excess of $30,000,000.00.

## GENERAL ALLEGATIONS

16. Defendant Fly Victor is a private jet and air charter broker that engages in website development to procure prospective private jet clients to charter private jets through both their online website and mobile applications. Its primary services include content search optimization, supplying prospective consumers with an automated private jet booking platform, hosting and web support of the private jet service landing page and website, and the redirection of the website landing pages to Defendant Fly Victor's owned and managed website landing page, FlyVictor.com.

17. In January 2010, Defendant Fly Victor was founded by Defendant Jackson. Defendant Jackson was one of Fly Victor's initial angel investors and was, at all times material hereto, its Chief Executive Officer and one of its Directors.

18. Shortly after Defendant Fly Victor's inception, in October 2010, Defendant Vorster was appointed as its Accountant and Principal Director.

19. In June 2014, after having years-long business relationships with Defendants Jackson and Vorster, Defendant Northover was named Defendant Fly Victor's Chief Marketing Officer.

20. In 2014, Defendant Jackson publicly announced his desire to acquire internet domain assets in order to build Fly Victor's online presence.  One of these assets was PrivateJet, which, as of 2014 was owned by Plaintiff DLM.

21. In July 2015, Defendants Jackson, Vorster and Northover engaged in communications with Plaintiff DLM relative to the prospect of PrivateJet moving from its current contractual relationship, a United States operation, to Fly Victor's platform. More specifically, at the time of the initial discussions, PrivateJet was being licensed to one of Fly Victor's largest competitors – Jetsmarter.com ("Jetsmarter").

22. In July 2015, Plaintiff DLM owned and managed PrivateJet which had been in the global internet market place creating revenue-generating initiatives for several start-ups in the private jet charter industry making it a turn-key fit for Defendant Jackson's vision for building Fly Victor's online presence.

23. On July 1, 2015, Plaintiff and Defendant Fly Victor entered into that certain "***Revenue Sharing Agreement***" ("RSA") wherein the parties agreed that Plaintiff would provide Defendant Fly Victor the exclusive license and rights to design, manage, build and operate PrivateJet for the purpose of creating a second business vertical to channel private jet charter customers. In exchange, *inter alia,* Defendant Fly Victor would design and build PrivateJet by continuously adding content and search engine optimization on both a newly – developed landing page and website, which would include a state-of-the-art booking platform for PrivateJet to aggregate private jet charters in an automated fashion, and to offer clients exclusive "Empty Leg" or one-way discounted private jet offerings. All these obligations were to be instituted in accordance with "good" industry practices and subject to the regulations by the FAA and the USDOT.

24. As an obligation to generate revenue under the RSA and in accordance with normal business practices, Defendant Fly Victor agreed that it would spend at least Two Thousand Five Hundred Dollars and No/100 ($2,500.00) per month on Google Pay-Per-Click advertising starting on month four (4) (i.e. November 1, 2015) to ensure the profitability of PrivateJet. Defendant Fly

Victor also agreed that under its responsibilities as an exclusive licensee of PrivateJet and as a digital website developer, it would share the gross profit of each booking received from the license for use of PrivateJet with Plaintiff.

25. Additionally, as condition of the exclusive license to build, design, optimize, promote, operate, and maintain Plaintiff's landing page and website, Defendant Fly Victor also agreed that it would maintain PrivateJet in accordance with "Good Industry Practice", which by Defendant Fly Victor's own definition meant that it would exercise levels of skill, care and diligence, prudence and foresight as can be reasonably expected from a skilled and experienced person engaged in the same or similar type of undertaking under the same or similar circumstances as Defendant Fly Victor.

26. Unbeknownst to Plaintiff, Defendants Jackson, Vorster, Northover and John Doe(s), collaborated prior to and during the drafting of the RSA for purposes of defrauding Plaintiff as these Defendants had no intention of Fly Victor honoring any of its obligations under the RSA.

27. Moreover, the RSA was drafted by Fly Victor and finalized with unnegotiated provisions, including, but not limited to, choice of venue and choice of law clauses, with the underlying intent to defraud Plaintiff. Defendants Fly Victor, Jackson, Vorster, Northover and John Doe(s) intentionally added the choice of law and venue clauses to make it difficult or impossible for Plaintiff to enforce its rights once the fraud was discovered – if ever. Indeed, the RSA itself was the fraudulent inducement for Plaintiff to license PrivateJet to Defendant Fly Victor and the same is part of the scheme and enterprise forming Plaintiff's claims in Count I.

28. Moreover, the venue provision of the RSA, on its face, permits Defendant Fly Victor to choose any venue, including Florida courts, to enforce its rights under the contract, but is silent as to Plaintiff's reciprocal right.

29. The fraudulent misrepresentations during contract formation, specifically related to promises to perform, were relied upon by Plaintiff in its execution of the RSA. As such, the RSA design regarding choice of venue and choice of law provisions themselves provide further evidence of the scope of these Defendants' wrongdoing as the RSA's architects intended to ***weaponize*** the choice of venue and choice of law provisions as a shield to protect their fraudulent scheme and enterprise.

30. Upon information and belief, PrivateJet created multi-million-dollar revenues which continue to benefit Defendant Fly Victor, and Plaintiff has not received one dollar in remunerations from these revenues as required by the RSA.

31. In December 2017, Defendants Alyssum and Alyssum Holdings were formed as Defendant Fly Victor's parent corporations as insulation and diversion schemes to conceal and hide Defendant Fly Victor's revenues.  On the surface, these two Defendants were formed to host and initiate private air charter relationships and connections – yet more nefariously to defraud Plaintiff and others.

32. All conditions precedent to the filing of the claims herein have either occurred, been satisfied or been waived.

33. Due to the conduct of Defendants, Plaintiff has retained undersigned counsel to prosecute this action and has agreed to pay reasonable attorneys' fees and costs.

34. **JURY DEMAND:** Plaintiff demands that all issues in this case be tried by a jury in accordance with the Seventh Amendment to the United States Constitution and Rule 38(b) of the Federal Rules of Civil Procedure.

**COUNT I**
**VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT**
**ORGANIZATIONS ACT ("CIVIL RICO") PURSUANT TO**
**18 U.S.C. § 1962(c) AND 18 U.S.C. § 1962(d)**

35. Plaintiff realleges Paragraph Numbers 1 through 34 above as if fully set forth herein.

36. This is an action for damages pursuant to 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d) "Civil Racketeering" against Defendants Jackson, Vorster, Northover, and John Doe(s) ("RICO Defendants").

37. RICO Defendants are all "persons" under 18 U.S.C. § 1961(3).

38. RICO Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting affairs of a RICO enterprise through a pattern of racketeering activity.

39. RICO Defendants violated 18 U.S.C. § 1962(d) by conspiring to participate in or conduct affairs of a RICO enterprise through a pattern of racketeering activity.

40. RICO Defendants have constituted an "enterprise" as the term is defined in 18 U.S.C. § 1961(4), that is, a group of business entities and individuals associated in fact, which is engaged in, and the activities of which affected, interstate commerce and foreign commerce. Each Defendant participates in the operation and management of the enterprise.

41. The criminal enterprise of this case involves numerous acts of theft, manipulation, deceit and the destruction of Plaintiff and Plaintiff's property. Among the components of this enterprise are: (1) the theft of revenues received by Defendant Fly Victor generated through leads procured by PrivateJet; (2) the manipulation of corporate financial statements to lure unsuspecting investors and potential investors for purposes of acquiring capital infusions; (3)

10

illegally laundering Plaintiff's unpaid remunerations and investor capital infusions through a complex international corporate spiderweb designed to line the pockets of the RICO Defendants and their various corporate entities without detection; and (4) a plan to destroy PrivateJet's brand and value by purposely violating USDOT and FAA regulations during Defendant Fly Victor's tenure as a licensee of PrivateJet.

42. The RICO Defendants are professional money launderers who purposely conceived, developed, and prosecuted a scheme to defraud Plaintiff out of tens of millions of dollars of revenue remunerations.

43. Defendants John Doe(s) is/are individual(s) and/or entity/ies who have intimate knowledge of the inner workings of Defendants Fly Victor, Alyssum, and Alyssum Holdings such as current or former officers, directors, executives, investors, affiliates, beneficiaries, and employees.

44. In 2015, Plaintiff and Defendant Jackson began negotiations for the exclusive license of the internet domain named PrivateJet owned by Plaintiff. On July 1, 2015, Plaintiff and Defendant Fly Victor entered into that certain RSA whereby Plaintiff agreed to exclusively license PrivateJet to Defendant Fly Victor.

45. Under the terms of the RSA, Defendant Fly Victor agreed to design, manage, build and operate PrivateJet. In exchange for this exclusive license, Defendant Fly Victor would share Gross Profits with Plaintiff for the term of three (3) years.

46. Notwithstanding the clear and unambiguous terms of the RSA, Defendant Fly Victor never shared a single profit from the substantial revenues generated by the thousands of leads procured by PrivateJet during the three-year tenure of the RSA.

47. In this case, the RICO Defendants devised an elaborate scheme to acquire and ultimately destroy PrivateJet, beginning with making materially false statements to Plaintiff (over the

telephone and through email transmissions) before, during and after entering into the RSA. These knowingly false statements included that: (1) Defendant Fly Victor would pay Plaintiff revenue shares for all leads generated by PrivateJet; (2) Defendant Fly Victor was actively working on its contractual obligations subsequent to the entry of the RSA; and (3) stating to Plaintiff that Defendant Fly Victor never received one single lead from PrivateJet in three years.

48. On or about November 20, 2015, after Plaintiff emailed Defendant Northover for several months asking about progress of PrivateJet, Defendant Northover advised Plaintiff that advertising and organic leads to drive potential private air charters to PrivateJet had commenced and were increasing daily. At that time, Defendant Northover admitted to Plaintiff that the paid search campaigns i.e. "Google Pay-Per-Click" had not yet commenced - even though the RSA clearly stated that this obligation should have commenced on month four (4), *to wit*:  November 1, 2015.

49. On November 20, 2015, Defendant Northover stated to Plaintiff that PrivateJet's website development and marketing had started generating "small numbers" of organic traffic. Defendant Northover also stated that United States leads on PrivateJet were increasing daily and "big gains" would be made once the paid search campaigns were in place. *See* Expert Opinion Letters relative to search engine optimization and website development attached hereto marked Composite Exhibit "A". However, Defendant Fly Victor never paid for any Google ad campaign in violation of the RSA, thus, any statements made by Defendant Northover relative to the same were empty falsehoods designed to keep Plaintiff from discovering the RICO Defendants' fraudulent scheme.

50. Notably, organic leads, in particular, and Pay-Per-Click advertising is considered to be the "Rodeo Drive" of revenue generating online traffic. *See* Article by author Doug Gollan attached hereto marked Exhibit "B"; *See also* Expert Opinion Letters attached hereto marked Composite Exhibit "A".

51. As such, pursuant to the RICO Defendants' illegal enterprise and scheme, Plaintiff never knew, or could have discovered, that it was being shorted millions of dollars of remunerations. Indeed, the breadth and scope of Plaintiff's loss remains undetermined except evidence exists that "thousands" of organic leads were procured by PrivateJet from 2015 to 2018.

52. What is clear is that the RICO Defendants' plan included terminating the RSA – in July 2018 – even though Defendant Northover had promised Plaintiff that the business relationship was full steam until the very end.

53. On July 25, 2018, Plaintiff's principle contacted and spoke with Defendant Northover, *inter alia,* over concerns that Plaintiff had not been paid for any lead generations for three years and that Plaintiff believed Defendant Fly Victor was in material breach of the RSA.   In response, Defendant Northover stated – for the very first time – that "he had not been able to get management's full backing for the project." This statement is beyond believable as Defendant Northover was Defendant Fly Victor's Chief Marketing Officer and he only reported to one individual – Defendant Jackson.

54. On August 21, 2018, Defendant Alyssum's lawyer Stephen Jones wrote Plaintiff a short email on behalf of Defendant Fly Victor which stated – falsely – that Plaintiff allegedly failed to complain about not getting paid during the term of the RSA and, thus, under the same – Plaintiff's claims for breach of contract were non-existent.  In other words, in just a few short paragraphs, the RICO Defendants, through their lawyer, sought to put the final nail in their criminal scheme by

13

telling Plaintiff to "just go away" – notwithstanding that they had stolen millions of dollars from Plaintiff over three (3) years.

55. In fact, Plaintiff consistently reached out to Defendant Northover from July 2015 through August 2018 regarding the status of payments and invoicing regarding monies owed. Plaintiff was met with excuse after excuse and promise after promise that it would be paid, and the reconciliations would be performed. The same never materialized.

56. As stated hereinabove and hereinbelow, the RICO Defendants consistently "cooked the books" to steal remunerations belonging to Plaintiff and funneled them into their own "consulting" companies and individually as "consultants".

57. Prior to and during the tenure of the RSA, Defendant Fly Victor received substantial revenues through leads generated by PrivateJet. These monies were used by the RICO Defendants to "pump up" the health and value of Defendant Fly Victor in order to lure unsuspecting private equity investors to infuse various rounds of capital funding. The RICO Defendants' enterprise and scheme also included the promotion of the alleged "professional accolades" of Defendants Fly Victor, Alyssum, and Alyssum Holdings, together with the RICO Defendants' subsidiary companies, specifically, YoungJets LLC, Fly Victor USA, Inc., and Victor Technology, Inc., in order to cast a spell of legitimacy as to its business strength and investment allure. Moreover, none of the underpinnings of these Defendants' money laundering activities were detectible through any normal means of due diligence.

58. During 2016 through 2018, the RICO Defendants funneled money out of Defendant Fly Victor directly into a spiderweb of international corporate entities of which they are the exclusive directors and corporate officers. Many of these entities do no other business as reported in their annual corporate filings – some of which were prepared and filed by Millie

Jackson, a practicing Solicitor in England – the daughter of Defendant Jackson. In fact, some of these corporate entities are in "liquidation proceedings" in England.

59.   Specifically, Sudranreb Consultancy LTD ("Sudranreb"), a company controlled by Defendant Vorster, received £50,167.00 in 2017, £60,833.00 in 2016, and £48,333.00 in 2015 for consultant fees. Oddly enough, Sudranreb showed unaudited records that do not account for these "consultant fees" nor does Sudranreb appear to be a functioning entity. Sudranreb's sole and major shareholder coincidentally is Defendant Vorster.

60. In 2011, Alexis Sozonoff ("Sozonoff") was appointed as a non-executive chairman and Director to Defendant Fly Victor.  Infinet Technologies SARL ("Infinet"), a company controlled by Sozonoff, received £74,407.00 in 2017 and £3,343.00 in 2016 for consultant fees. Sozonoff also received a massive "consultant fee" in 2017 and, during the same year, he was appointed as a director at Defendant Alyssum. Sozonoff is also a Director at Autotorq Limited ("Autotorq"), another one of Defendant Jackson's entities that Sozonoff has been affiliated with since 2003.

61. Longhurst Corporate Ltd. ("Longhurst"), a company controlled by Defendant Jackson received £12,650.00 in 2017, £140,625.00 in 2016, and £172,500.00 in 2015 for consultant fees without further explanation. In 2018, Longhurst was voluntarily dissolved having only claimed assets of £773.00 in 2017 and £537.00 in 2016.

62. Letyano Limited, while filed as a retail beverage company authorized to sell beverages in specialized stores as the nature of its business but appears to be an incentive driven application software company and who is controlled by Guy Winterflood, Defendant Fly Victor's previous Director, received £70,000.00 in 2017, and £21,000.00 in 2016 for consultant fees.

63. Autotorq, a company controlled by Defendant Jackson received £15,811.00 in 2017, £46,734.00 in 2016, and **£63,397.00** in **2015** for staff and offices costs. However, according to

Autotorq financial statements ending in 2017, Autotorq paid Defendant Fly Victor £148,932.00.  Autotorq also paid Defendant Fly Victor **£63,397.00 in 2016** – the same amount of money that Defendant Fly Victor paid Autotorq for staff and office costs in 2015.  These "staff and offices costs" were not reported as loans, but rather appear to cancel out for services rendered to either company both owned and operated by Defendant Jackson.

64. All these consultant and service fees that were paid to the aforementioned companies have one common theme – the controlling parties are all directors, board members, angel investors, or executive officers and employees of Defendants Fly Victor, Alyssum, and Alyssum Holdings. The RICO Defendants, whom directly or indirectly received the monies funneled out of Defendant Fly Victor were the knowing beneficiaries of unpaid remunerations due to Plaintiff.

65. Not only did the RICO Defendants funnel Plaintiff's rightfully – owed remunerations into consultation fees to pad their own pockets and purposely avoid taxes, the RICO Defendants, upon information and belief, also funneled monies into purchases of competing organizations, re-capitalization of their own existing corporations, and  "cooked the books" of Defendant Fly Victor so that investors would re-invest and potential new investors would fund Fly Victor's ongoing dominations of the private jet charter market.

66. In 2016, Defendant Fly Victor purchased its competition, YoungJets, and it also created and funded subsidiary companies, namely, Chartermatch Limited ("Chartermatch"), Fly Victor USA, Inc., and Victor Technology, Inc., all shell companies established merely disguised as alter-egos to funnel and hide revenues generated in large part by PrivateJet's web presence and established name.

16

67. As part of the ongoing enterprise, the RICO Defendants defrauded Plaintiff and conspired to deceive investors for personal financial benefit. As such, these Defendants were associated with an illegal enterprise, and conducted and participated in that enterprise's affairs through a pattern of racketeering activity consisting of numerous and repeated uses of interstate mail and wire facilities to execute a scheme of fraud and in ***violation of 18 U.S.C. §§ 1341 and 1343 and international money laundering and tax evasion laws.***

68. To carry out, or attempt to carry out the scheme to defraud, the Defendants have conducted or participated in the conduct of the affairs of the RICO Enterprise through the following pattern of racketeering activity that employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud):

    a. The RICO Defendants devised and furthered the scheme to defraud Plaintiff by use of the mail, telephone, and internet, and transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, writing(s) and/or signal(s), including the RICO Defendants' websites, communications with Plaintiff, statements to the press, and communications with other members of the RICO Enterprise, as well as advertisements and other communications to Defendant Fly Victor's consumers; and

    b. The RICO Defendants utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described herein.

69. The RICO Defendants profited handsomely from the enterprise and Plaintiff suffered because the enterprise defrauded it of the revenue share remunerations and demolished PrivateJet from any future use by Plaintiff or Defendant Fly Victor's competitors or potential competitors.

70. At all relevant times, the RICO Defendants were associated-in-fact for the common purpose of engaging in their profit-making scheme. These members of the RICO enterprise all share a common purpose: to enrich themselves at the expense of Plaintiff and unsuspecting investors. The RICO Defendants share the bounty of their criminal enterprise – by sharing the financial gain from their fraudulently – obtained assets and by defrauding investors.

71. Each participant in the RICO Enterprise had systematic linkage to each other through corporate ties, contractual relationships, employment, financial ties and continuing coordination of activities. The RICO Enterprise and the RICO Defendants functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purpose of increasing Defendant Fly Victor's website presence and net worth for their own financial gain.

72. The RICO Defendants participated in the operation and management of the RICO Enterprise by directing its affairs as described herein.

73. While the RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, reporting requirements and financial statements.

74. The RICO Enterprise has existed for more than two (2) years and continues to exist and operate.

75. The RICO Defendants conducted and participated in the affairs of the RICO Enterprise through a pattern of racketeering activity that consisted of repeated violations of the federal mail and wire fraud statutes and violations of federal and international money laundering and tax evasion laws.

76. Furthermore, the RICO Defendants continue to engage in these predicate acts to harm Plaintiff and the general public on a daily basis, which establishes a threat of long-term racketeering activity and evidences the continuity of the RICO Defendants' open-ended pattern of racketeering activity.

77. The RICO Defendants had the specific intent to participate in the overall RICO Enterprise, which is evidenced by the scheme to defraud Plaintiff, Defendant Fly Victor's unsuspecting investors and potential investors, and the general public. This scheme was reasonably calculated to deceive Plaintiff, unsuspecting investors, and potential investors for the financial windfall of Defendants.

78. The RICO Defendants' violations of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d) have directly and proximately caused injuries and damages to Plaintiff, and Plaintiff is entitled to bring this action for three times its actual damages, as well as injunctive and equitable relief and costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

79. Pursuant to the RICO Defendants' conduct, Plaintiff has been damaged.

**WHEREFORE,** Plaintiff demands judgment as to Count I against the RICO Defendants for compensatory and treble damages together with interest, attorneys' fees and costs for instituting and prosecuting the instant action and for such further relief as this Court deems just and proper.

**COUNT II**
**CONVERSION**

80. Plaintiff realleges Paragraph Numbers 1 through 34 above as if fully set forth herein.

81. At all times material hereto, the asset known as "PrivateJet.com" was and remains the property of Plaintiff DLM.

82. At all times material hereto, Defendants Fly Victor, Alyssum and Alyssum Holdings ("Conversion Defendants") intentionally and substantially interfered with PrivateJet by failing to

comply with USDOT and FAA regulations, *to wit*:  49 U.S.C. § 41712, Unfair and Deceptive Practices and Unfair Methods of Competition and 14 C.F.R. § 399.80 Unfair and Deceptive Practices of Ticket Agents and Part 135 of the Federal Aviation Administration.

83. Specifically, PrivateJet was substantially and irreparably damaged by the Conversion Defendants because these Defendants' design, maintenance and development of PrivateJet violated the above referenced USDOT and FAA Regulations as the same did not clearly disclose and/or convey that PrivateJet was not a direct air carrier and that the air services advertised would be provided by a licensed carrier. Additionally, Defendants' conduct resulted in possible violations for failure to disclose that the aircrafts to which Defendants had access to were owned and operated by third parties. *See* Expert Opinion Letter from Zuckert, Scoutt & Rasenberger, L.L.P. attached hereto marked as Exhibit "C".

84. Additionally, in or about February 2019, in an amicable attempt to resolve all issues herein, Plaintiff through undersigned counsel, advised Defendants Fly Victor, Alyssum, and Alyssum Holdings about the potential USDOT and FAA regulation violations on their website. Again, Defendants Fly Victor, Alyssum, and Alyssum Holdings "blew off" Plaintiff's continuing concerns.

85. Notwithstanding Plaintiff's attempts to resolve the underlying aforementioned USDOT and FAA regulation compliance issues, Defendants Fly Victor, Alyssum, and Alyssum Holdings made a shoddy attempt to remediate its own website – however, only further damaging its website and Plaintiff.

86. As a direct and proximate result of the Conversion Defendants' intentional and substantial interference and irreparable damage to PrivateJet by non-compliance with the

USDOT and FAA's regulations as stated above, a civil penalty of more than $32,000.00 per violation, per day may continue to accrue on PrivateJet.

87. At all times material hereto, Plaintiff did not have knowledge of, nor consented to, the omissions of any required regulatory language on or regarding PrivateJet in any manner.

88. Defendant Alyssum, as the parent company and principal responsible for the acts of Defendant Fly Victor, its subsidiary, is vicariously liable to Plaintiff for the harm caused to Plaintiff as the result of Defendant Fly Victor's conversion of PrivateJet.

89. Alternatively, Defendant Alyssum is directly liable to Plaintiff for harm caused to Plaintiff as a result of the conversion of Plaintiff's Asset committed by Defendant Fly Victor as an apparent or ostensible agent of Defendant Alyssum.

90. Defendant Alyssum Holdings, as the parent company and principal responsible for the acts of Defendant Alyssum, its subsidiary, is vicariously liable to Plaintiff for the harm caused to Plaintiff as the result of Defendant Fly Victor's conversion of PrivateJet.

91. Alternatively, Defendant Alyssum Holdings is directly liable to Plaintiff for harm caused to Plaintiff as a result of the conversion of Plaintiff's Asset committed by Defendant Fly Victor as an apparent or ostensible agent of Defendant Alyssum Holdings.

92. As a direct and proximate result of Conversion Defendants' intentional or reckless conduct described hereinabove, Plaintiff has suffered damages in an amount to be proven at trial, including an award of punitive damages.

93. Additionally, Plaintiff's damages are ongoing and increasing due to the Conversion Defendants failure to comply with the requirements of the USDOT regulations, 49 U.S.C. § 41712, Unfair and Deceptive Practices and Unfair Methods of Competition, and 14 C.F.R. § 399.80,

Unfair and Deceptive Practices of Ticket Agents and Part 135 of the Federal Aviation Administration.

94. Plaintiff asserts a claim for punitive damages due to the Conversion Defendants' intentional and malicious and deceitful conduct alleged herein.

**WHEREFORE,** Plaintiff demands judgment as to Count II against the Conversion Defendants for compensatory and punitive damages, together with interest, attorneys' fees and costs for instituting and prosecuting the instant action and for such further relief as this Honorable Court deems just and proper.

**COUNT III**
**FRAUDULENT TRANSFERS**

95. Plaintiff realleges Paragraph Numbers 1 through 34 as if fully set forth herein.

96. This is an action for equitable and other relief pursuant to the Uniform Fraudulent Transfer Act, Florida Statute §726.101 et. seq. and Florida Statute §56.29.

97. Upon information and belief, Defendants Jackson, Vorster, Northover, Fly Victor, Alyssum and Alyssum Holdings ("Transfer Defendants") have engaged in fraudulent acts in furtherance of a fraudulent scheme to transfer Plaintiff's unpaid remunerations out of the reach of Plaintiff.

98. On July 1, 2015, Plaintiff and Defendant Fly Victor entered into that certain RSA whereby Plaintiff agreed to exclusively license – and Defendant Fly Victor agreed to design, manage, build, and maintain – PrivateJet.

99. Despite the contractual obligations of the RSA, Plaintiff never received one dollar of revenue remunerations.

100. Instead, upon information and belief, the Transferor Defendants, transferred Plaintiff's unpaid remunerations and capital investments from unsuspecting investors and potential

investors to these Defendants personally and to Defendants' owned and operated entities, *to wit*: Transfer Defendants Jackson, Vorster, Northover, Fly Victor, Alyssum, Alyssum Holdings and the Transfer Defendants' other entities and/or directors, Autotorq, YoungJets, Fly Victor USA, Victor Technology, Chartermatch, Infinet, Sudranreb, Letyano, Mike Ryan, Adrian Kee, Richard Mark Batchelor, Nick Earle, Amin Hemani, Nathan Akira Kirton, Elio Lenoi-Sceti, George Ortiz, Andrew Julian Pisker, Guy Winterflood, Joe Cohen, and David Young all received shares, dividends, consulting fees, marketing fees, business capital injections, or profits from the illicit transfer of funds by the Transfer Defendants.

101. All of these transfers were made by the Transfer Defendants while each entity or individual was either failing, insolvent or otherwise upside down because the liabilities incurred by those ventures and/or individuals far exceeded their assets and/or abilities to pay.

102. These illicit and fraudulent transfers made by the Transfer Defendants to the Transfer Defendants and their other entities and/or directors were made without adequate compensation or justification.

103. The transfers were made by systematic and continuous revenue sharing or fraudulent transfer between individual Defendants and their owned and operated business endeavors with the actual intent to hinder, delay or defraud creditors such as Plaintiff and/or to evade tax consequences. The same constitutes a fraudulent transfer in violation of Florida Statue §726.105(1)(a). Further, the Transfer Defendants did not receive reasonably equivalent value for the transfers and intended to incur – or believed or reasonably should have believed that they would incur – debts beyond their ability to pay as they become due, and thus the transfer at issue is in violation of §726.105(1)(b). Plaintiff is thus, entitled to relief under §726.108.

104. Plaintiff lacks an adequate remedy at law because, unless the relief sought in this count is granted, the Transferor Defendants will have succeeded in fraudulently transferring assets beyond the reach of Plaintiff.

**WHEREFORE,** Plaintiff demands judgment as to Count III for fraudulent transfer and requests that this Court grant the following relief: (1) an appointment of a receiver to take charge of Defendants' assets; (2) an injunction against further disposition or assignment of remunerations; (3) a Judgment decreeing that the fraudulent transfers are void and directing the appropriate authority to take the transferred remunerations to satisfy execution; (4) an award of Plaintiff's attorneys' fees and costs for having to file and prosecute this action and; (5) for such further relief as this Court deems just and proper.

## COUNT IV
## FRAUDULENT MISREPRESENTATION

105. Plaintiff incorporates and realleges Paragraph Numbers 1 through 34 above as if fully set forth herein.

106. Defendants Fly Victor, Jackson, Northover, and Vorster ("Fraudulent Misrepresentation Defendants") willfully and intentionally made material misrepresentations to Plaintiff before, during and after the termination of the RSA.

107. More specifically, the Fraudulent Misrepresentation Defendants willfully and intentionally misrepresented to Plaintiff that it would supply booking platforms, host and support the landing page and website, service all bookings generated through PrivateJet in accordance with "Good Industry Practices" as cited in Section 1: Definitions of the RSA.

108. Additionally, the Fraudulent Misrepresentation Defendants willfully and intentionally misrepresented to Plaintiff that it would redirect the domain PrivateJet to Defendant Fly Victor's managed destination landing page.

24

109. Moreover, the Fraudulent Misrepresentation Defendants willfully and intentionally misrepresented to Plaintiff that it would spend up to $2,500.00 per month for Google Pay-Per-Click advertisements for months 4 through 36 of the parties' agreement.

110. Further, the Fraudulent Misrepresentation Defendants willfully and intentionally misrepresented to Plaintiff that it would generate revenue share remuneration through Defendant Fly Victor's gross profits of each booking from the PrivateJet landing page and website.

111. Fraudulent Misrepresentation Defendants' statements were made intending solely to defraud Plaintiff and prevent it from engaging in fruitful or productive competition with Defendant Fly Victor through various other competitor partnerships.

112. The Fraudulent Misrepresentation Defendants made fraudulent misrepresentations and Plaintiff reasonably and justifiably relied on those fraudulent misrepresentations and licensed and contracted with Defendant Fly Victor in good faith to its detriment.

113. The Fraudulent Misrepresentation Defendants' unconscionable acts are fraudulent, deceitful and were committed intentionally to significantly and irreparably harm Plaintiff.

114. Due to the Fraudulent Misrepresentation Defendants' conduct, Plaintiff has been damaged.

115. Plaintiff asserts a claim for punitive damages as due to the Fraudulent Misrepresentation Defendants' intentional and malicious as alleged herein.

**WHEREFORE,** Plaintiff demands Judgment as to Count IV against the Fraudulent Misrepresentation Defendants and seeks an award of compensatory and punitive damages, together with interest, attorneys' fees and costs for instituting and prosecuting the instant action and for such further relief as this Court deems just and proper.

## COUNT V
## <u>NEGLIGENCE</u>

116. Plaintiff realleges Paragraph Numbers 1 through 34 above as if fully set forth herein.

117. Defendants Fly Victor Alyssum, and Alyssum Holdings ("Negligence Defendants") had a duty to exercise ordinary care to provide services with skill, care and diligence in accordance with good industry practices and to act as reasonably prudent business entities by designing and maintaining PrivateJet in accordance with USDOT and FAA regulations.

118. Under this duty the Negligence Defendants were required to ensure their content and advertisements on PrivateJet were in compliance with the standards of air carrier service providers as regulated by the USDOT and FAA. Specifically, the Negligence Defendants had the obligation to include in its content any and all mandatory disclosures.

119. The Negligence Defendants breached their duty to Plaintiff by failing to provide services with skill, care and diligence in accordance with good industry practices and failing to act as reasonably prudent business entities by failing to design and maintain PrivateJet in accordance with the USDOT and FAA regulations.

120. The Negligence Defendants also breached their duty to Plaintiff by failing to include in its content any and all mandatory disclosures.

121. The Negligence Defendants also breached their duty to Plaintiff by failing to perform the tasks necessary to ensure the website landing page would gain exposure to prospective clientele.

122. Defendant Fly Victor also breached its duty to Plaintiff to act as a reasonably prudent website developer when it breached performance under the RSA by failing to launch the website in accordance with the terms therein.

123. Defendant Fly Victor also breached its duty to Plaintiff by failing to pay any gross profit to Plaintiff because it failed to spend up to $2,500.00 a month in Google Pay-Per-Click advertisements.

124. Defendant Alyssum, as the parent company and principal responsible for the acts of Defendant Fly Victor, its subsidiary, is vicariously liable to Plaintiff for the harm caused to Plaintiff as the result of Defendant Fly Victor's negligence of PrivateJet.

125. Alternatively, Defendant Alyssum is directly liable to Plaintiff for harm caused to Plaintiff as a result of the negligence of Plaintiff's Asset committed by Defendant Fly Victor as an apparent or ostensible agent of Defendant Alyssum.

126. Defendant Alyssum Holdings, as the parent company and principal responsible for the acts of Defendant Alyssum, its subsidiary, is vicariously liable to Plaintiff for the harm caused to Plaintiff as the result of Defendant Fly Victor's negligence of PrivateJet.

127. Alternatively, Defendant Alyssum Holdings is directly liable to Plaintiff for harm caused to Plaintiff as a result of the negligence of Plaintiff's Asset committed by Defendant Fly Victor as an apparent or ostensible agent of Defendant Alyssum Holdings

128. As a direct and proximate result of the Negligence Defendants breaches of duties, Plaintiff has suffered substantial and irreparable harm and damages in an amount to be proven at trial.

**WHEREFORE,** Plaintiff demands Judgment as to Count V against the Negligence Defendants and seeks an award of compensatory damages together with interest, attorneys' fees and costs for instituting and prosecuting the instant action and for such further relief as this Court deems just and proper.

## COUNT VI
## <u>BREACH OF FIDUCIARY DUTY – FLY VICTOR</u>

129. Plaintiff realleges Paragraph Numbers 1 through 34 above as if fully set forth herein.

130. At all times relevant to this action, Defendant Fly Victor owed a fiduciary duty of care to Plaintiff.

131. Defendant Fly Victor's fiduciary duties include obligations to exercise good business judgment, to act prudently in the operation of its business, and to discharge their actions in good faith.

132. Specifically, Defendant Fly Victor owed a fiduciary duty to Plaintiff to ensure compliance with USDOT and FAA regulations in its content and advertising on PrivateJet.

133. Defendant Fly Victor breached its duty of care to Plaintiff by, among other things, failing to comply with the terms of the RSA and by failing to comply with the regulations of the USDOT and FAA regulations by failing to include mandatory disclosures while hosting, operating, and maintaining PrivateJet.

134. Defendant Fly Victor further breached its duty of care to Plaintiff by, upon Plaintiff's notice and advice about the USDOT and FAA regulations violations in or about February 2019, Defendants failed to substantially, accurately or correctly remediate their websites content and advertising to comply with the mandatory disclosures of the USDOT and FAA regulations.

135. As a result, Plaintiff has suffered harm as a direct and proximate result of the aforementioned breach of duty by Defendant Fly Victor.

**WHEREFORE**, Plaintiff demands Judgment as to Count VI Defendant Fly Victor and seeks compensatory damages together with interest, attorneys' fees and costs for instituting and prosecuting the instant action and for such further relief as this Court deems just and proper.

## COUNT VII
## <u>TORTIOUS INTERFERENCE WITH BUSINESS ADVANTAGE</u>

136. Plaintiff incorporates and realleges Paragraphs 1 through 34 above as if fully set forth herein.

137. Defendants Jackson, Vorster, Northover, Fly Victor, Alyssum, Alyssum Holdings ("Tortious Interference Defendants") had knowledge of certain business advantages relative to Plaintiff's ongoing and potential business relationships with website developers, private air charter brokers, advertisers and employees.

138. The Tortious Interference Defendants wrongfully interfered with Plaintiff's business relationships by making false misrepresentations to Plaintiff causing Plaintiff to enter into the RSA.

139. The Tortious Interference Defendants intentionally interfered with Plaintiff's business advantages and relationships through their conduct outlined herein.

140. Pursuant to the Tortious Interference Defendants' intentional/negligent conduct, Plaintiff has suffered actual damages.

141. Plaintiff asserts that it is entitled to an award of punitive damages pursuant to the Tortious Interference Defendants' intentional and malicious conduct designed to cause Plaintiff damages.

**WHEREFORE,** Plaintiff demands Judgment as to Count VII against the Tortious Interference Defendants for compensatory and punitive damages together with interest, attorneys' fees and costs for instituting and prosecuting the instant action and for such further relief as this Court deems just and proper.

## COUNT VIII
## <u>BREACH OF CONTRACT – FLY VICTOR</u>

29

142. Plaintiff incorporates and realleges Paragraphs 1 through 34 above as if fully set forth herein.

143. On July 1, 2015, Plaintiff and Defendant Fly Victor entered into that certain RSA whereby Plaintiff agreed to appoint Defendant Fly Victor as a provider of web-based booking services to Plaintiff and Plaintiff agreed to allow Defendant Fly Victor the use of his domain, PrivateJet, for the web-based booking services.

144. Under the terms of the RSA, Defendant Fly Victor agreed to develop, design, redirect, and use PrivateJet for no less than thirty-six (36) months at a revenue share as laid out in Schedule 1 – Schedule of Services.  In Schedule 2 – Price Schedule, of the agreement, all initial bookings of all jet charters booked through PrivatetJet, Defendant Fly Victor would receive 60% of the fees and Plaintiff would receive 40%.  Subsequent bookings would be split 90% to Defendant and 10% to Plaintiff.  Defendant Fly Victor would also pay Plaintiff $2,500.00 for months 6-24 and $5,000.00 for months 25-36 in the event that the minimum revenue targets were not met. Defendant Fly Victor also had the responsibility to spend at least $2,500.00 per month on Google Pay-Per-Click advertising commencing on month four (4) of the agreement until the end of the Initial Term.

145. Defendant Fly Victor breached the Agreement by failing to perform any of the duties in the RSA.

146. Defendant Fly Victor also breached the RSA by failing to make ANY payments due to Plaintiff.

147. Defendant Fly Victor also breached the RSA by failing to institute "Good Industry Practice" in that it failed to comply with DOT regulations, 49 U.S.C. § 41712, Unfair and Deceptive Practices and Unfair Methods of Competition and 14 C.F.R. § 399.80, Unfair and

Deceptive Practices of Ticket Agents. Specifically, Defendant Fly Victor failed to clearly disclose and/or convey that PrivateJet was not a direct air carrier and that the air services advertised would be provided by a licensed carrier.

148. Additionally, Defendant Fly Victor breached its duty to institute "Good Industry Practice" because it failed, in their marketing and/or advertisements on PrivateJet, to disclose that the aircrafts to which Defendant Fly Victor had access to, were owned and operated by third parties.

149. As a direct and proximate result of Defendant Fly Victor's breaches of the RSA, Plaintiff has been damaged.

**WHEREFORE,** Plaintiff demands judgment as to Count VIII against Defendant Fly Victor and seeks an award of compensatory damages, together with interest, attorneys' fees and costs for instituting and prosecuting the instant action and for such further relief as this Court deems just and proper.

**COUNT IX**
**UNJUST ENRICHMENT- JOHN DOE(S)**

150. Plaintiff incorporates and realleges Paragraphs 1 through 22 above as if fully set forth herein.

151. Plaintiff conferred, either directly or indirectly, benefits on Defendant John Doe(s) who were investors in Defendant Fly Victor.

152. As investors in Defendants, Fly Victor, Alyssum and Alyssum Holdings, Defendant(s) John Doe(s) are/have members who collect revenues, shares, dividends, or stocks.

153. Plaintiff conferred a benefit either directly or indirectly on Defendant(s) John Doe(s) by allowing Defendants Fly Victor, Alyssum and Alyssum Holdings the exclusive license and rights to PrivateJet.

154. Defendant(s) John Doe(s) accepted and retained the conferred benefit.

155. Under the aforementioned circumstances it would be inequitable for Defendant(s) John Does(s) to retain the benefit without compensating Plaintiff for it.

156. Defendant(s) John Doe(s) have been unjustly enriched at the expense of Plaintiff.

157. Plaintiff is entitled to damages as a result of Defendant(s) John Doe(s)' unjust enrichment, including the disgorgement of all monies accepted by Defendant(s) John Doe(s) from Plaintiff.

**WHEREFORE,** Plaintiff demands judgment as to Count IX against Defendant(s) John Doe(s) and seeks for an award of compensatory damages, together with interest, attorneys' fees and costs for instituting and prosecuting the instant action and for such further relief as this Court deems just and proper.

## COUNT X – AIDING & ABETTING

158. Plaintiff incorporates and realleges Paragraphs 1 through 34 above as if fully set forth herein.

159. Defendants John Doe(s) is/are past/present directors, officers, shareholders, managers, executives and/or employees of Defendants Fly Victor, Alyssum and Alyssum Holdings,  who manage, develop, and/or operate the daily transactions and inner-workings of Defendants Fly Victor, Alyssum and Alyssum Holdings by assisting, training, managing, and overseeing the marketing, financial transactions, investments, agreements, and operations of Defendants Fly Victor, Alyssum and Alyssum Holdings' businesses and financial enterprises.

160. Defendant John Doe(s), through their positions as acting directors, officers, shareholders managers, executives, employees and/or board members, rendered substantial assistance to Defendants Jackson, Vorster, Northover, Fly Victor, Alyssum, and Alyssum Holdings in their perpetration of conversion, fraudulent misrepresentation, and fraudulent transfers alleged herein.

161. But for Defendants John Doe(s) active or passive participation in conversion, fraudulent misrepresentation and fraudulent transfers, same would not have succeeded, and Plaintiff would not have been victimized by Defendants Jackson, Vorster, Northover, Fly Victor, Alyssum and Alyssum Holdings.

162. In their respective positions, Defendants John Doe(s) failed to institute adequate policies and procedures to monitor and prevent the very type of fraud and scheme that occurred as alleged hereinabove.

163. Upon information and belief, Defendant John Doe(s) had actual or constructive knowledge of the conversion, fraudulent misrepresentations and fraudulent transfers against Plaintiff as alleged herein and they all played active and/or passive vital roles in the success and maintenance/expansion of the fraudulent malfeasance.

164. As a direct and proximate result of the foregoing, Defendant John Doe(s) are liable for damages caused to Plaintiff through Defendants Jackson, Vorster, Northover, Fly Victor, Alyssum and Alyssum Holdings' fraudulent actions and omissions.

**WHEREFORE,** Plaintiff demands entry of a judgment as to Count X against Defendant John Doe(s) for compensatory damages and costs and for such further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands that all issues in this case be tried by a jury in accordance with the Seventh

Amendment to the United States Constitution and Rule 38(b) of the Federal Rules of Civil

Procedure.

Dated June 21, 2019.

Respectfully submitted,

**FARROW LAW, P.A.**
***A Litigation Law Firm***

Attorneys for Plaintiff
4801 South University Drive
Suite 132
Davie, Florida 33328
Telephone:  (954) 252-9818
Facsimile:   (954) 252-9821
jay@farrowlawfirm.com

BY:   /s/*JAY L. FARROW, ESQ.*.
    JAY LEWIS FARROW, ESQUIRE
    Florida Bar Number: 625213
    New York Bar Number: 4329967